UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

-vs-

D-3 DOMINQUE HAYES,

               Defendant.

_____/

Case No: 17-20292

Hon. David M. Lawson

**UNITED STATES' COMBINED RESPONSE AND BRIEF
OPPOSING THE DEFENDANT'S MOTION FOR
<u>COMPASSIONATE RELEASE</u>**

On April 17, 2018, Dominique Hayes was sentenced to 60 months in federal prison for conspiracy to commit interference with commerce by robbery, interference with commerce by robbery, brandishing a firearm during and in relation to a crime of violence (aiding and abetting), and, misleading communication to hinder the investigation of a federal offense. Hayes's current projected release date is August 14, 2022. Hayes now moves for compassionate release, under 18 U.S.C. § 3582(c)(1)(A), requesting the Court to reduce his sentence and release him directly to his mother's home. This request should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of June 18, 2020, these directives have already resulted in at least 4,310 inmates being placed on home confinement. *See BOP Covid-19 Website.*

*Second*, Hayes does not qualify for compassionate release. None of Hayes's characteristics qualify him for compassionate release under 18 U.S.C. § 3582(c)(1)(A). He has not identified a significant medical condition which would qualify as an extraordinary and compelling reason, and the seriousness of his crimes and his role in those offenses dictate that he should continue to serve his sentence.

## Background

In early April 2017, Arkem Hammock, Jeremy Sherrod, and Dominque Hayes planned an armed robbery of Heritage Pharmacy Services in Southfield, Michigan. Defendant Hayes was employed at the pharmacy as a technician. He supplied critical information about the business to Hammock and Sherrod -- including when medications were delivered, where controlled substances were kept, and the best day to commit the crime. Defendant exploited his knowledge about the pharmacy to benefit himself, Hammock and Sherrod. Dominque Hayes was the proverbial fox guarding the hen house.

On April 25, 2017, Hammock and Sherrod ambushed a female employee who had come to the back door of the pharmacy. They were dressed in dark clothing and they wore masks and gloves to disguise their appearance. Both were armed with large guns. Hammock and Sherrod stormed the business and forced the employees to floor at gunpoint. Hammock held the employees at bay with a firearm while Sherrod emptied the shelves of its fentanyl, Oxycontin, and morphine. All of the employees cowered in fear – except Dominque Hayes.



Dominque Hayes sat, leaning against the cabinets, unbothered by the chaos going on around him. Everyone else was face down on the floor. Apparently, Hayes could afford to sit comfortably because he knew his family members (Hammock and Hayes) would not hurt him. More, Hayes agreed that his kinfolk would pay him for his role in this conspiracy. So Hayes played the "victim" as his co-workers were inconsolable, crying, and praying for their lives. Defendant Hayes continued his charade when law enforcement arrived to investigate this crime. Hayes was interviewed by the police but his initial statement was brief. Hayes kept his familial relationship to the gunmen secret and he did not reveal their sinister plan.

Defendant Hayes continued to shield his co-conspirators in the weeks that followed. On May 30, 2017, the FBI presented photo line-ups to Hayes which included pictures of Arkem Hammock and Jeremy Sherrod. Hayes said he did not know them even though Hammock is his cousin and Sherrod is his uncle. As the investigation continued, Hayes's story began to unravel. He could no longer deny his role in the offenses given the evidence that had mounted against him. Greed motivated the Defendant's participation in this armed robbery. Fear of the consequences drove his decision to mislead the police and cover for Sherrod and Hammock.

On June 27, 2017, a first superseding indictment was returned by a federal grand jury which charged Defendant Hayes with conspiracy to commit interference with commerce by robbery, interference with commerce by robbery, brandishing a firearm during and in relation to a crime of violence (aiding and abetting), and, misleading communication to hinder the investigation of a federal offense, all in violation of 18 U.S.C. §§1951, 924(c)(1)(A), and 1512(b). On October 5, 2017, Hayes entered guilty pleas to these offenses pursuant to a Rule 11 Agreement. Hayes received a sentence of 60 months.

5

Hayes began serving his prison sentence on May 15, 2018 and he is currently incarcerated at Fort Dix FCI. Hayes is 32-years-old, and his projected release date is August 14, 2022. Hayes has moved for compassionate release, citing his asthma, sleep apnea, and the Covid-19 pandemic. Hayes petitioned the warden for compassionate release on April 2, 2020. The warden denied Hayes's request on April 21, 2020 because his federal offense "involved violence" and "per guidelines of the CARES Act, inmates whose primary offense was violent will not be referred." (*Def. Mot., Page ID 524*).

## Argument

### I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.; see BOP Covid-19 Modified Operations Website*. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id*. When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id*. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id*.

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." Id. Staff and inmates are issued face masks to wear in public areas. *See BOP FAQs: Correcting Myths and Misinformation*. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if

performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. Id. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

## B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act)

8

§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).

The Attorney General has also issued two directives, ordering the

Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the

ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of

Prisons to identify the inmates most at risk from Covid-19 and "to

consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020

Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical.

Over 4,310 federal inmates have been granted home confinement since

the Covid-19 pandemic began, and that number continues to grow. BOP

Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts

show that "[t]he system is working as it should": "A policy problem

appeared, and policy solutions emerged." *United States v. Alam*, ___

F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19

pandemic. As the Attorney General's directives have explained, the

9

Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).*

10

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not

place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at \*6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Hayes's motion for compassionate release.

Hayes's motion for immediate release to his mother's home should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially

13

crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016);

*Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show

"extraordinary and compelling reasons" for compassionate release,

§ 3582(c)(1)(A), and release must be "consistent with" the Sentencing

Commission's policy statements. As with the identical language in

§ 3582(c)(2), compliance with the policy statements incorporated by

§ 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817

(2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To

qualify, a defendant must have a medical condition, age-related issue,

family circumstance, or other reason that satisfies the criteria in USSG

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety

of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release,

the district court may not grant the motion unless the factors in 18

U.S.C. § 3553(a) support release. *18 U.S.C. § 3582(c)(1)(A); USSG*

*§ 1B1.13*. As at sentencing, those factors require the district court to

consider the defendant's history and characteristics, the seriousness of

the offense, the need to promote respect for the law and provide just

punishment for the offense, general and specific deterrence, and the protection of the public. *18 U.S.C. § 3553(a)*.

### A.   There are no extraordinary and compelling reasons to grant Hayes's compassionate release.

Even though Hayes has exhausted his administrative remedies, compassionate release remains improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." *18 U.S.C. § 3582(c)(1)(A)*. Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. *28 U.S.C. § 994*.

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing

15

Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. *USSG § 1B1.13 cmt. n.1.* As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

16

Hayes relies on the medical conditions of asthma and sleep apnea as a reason for compassionate release, but he is not eligible for it on this basis. At 32, Hayes is not elderly, and is therefore not at higher risk from COVID-19 because of his age. Although he has asthma, Hayes's BOP medical records reveal that it is well controlled. Importantly, at least one article noted that asthma is not listed among those ailments which place persons in a higher-risk category for infection from COVID-19. Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows - The New York Times (Apr. 16, 2020). Having said that, Hayes was evaluated by medical personnel on May 11, 2020. His vitals and respiratory function were all "within normal limits." (*See Exhibit A, 2020 Medical Records, pgs. 1-3*). Hayes's sleep apnea is managed with a continuous positive airway pressure ("CPAP") machine. *Id.,* at pg. 4. There is no evidence that sleep apnea creates a higher risk of contracting Covid-19. *Temple Health: How to Manage Sleep Apnea During the Covid-19 Pandemic* (May 8, 2020 by Tahseen Shariff, CRT, RPSGT).

Hayes does not have the kinds of medical conditions for which other inmates have been granted compassionate release in light of the

17

COVID-19 pandemic. *See, e.g., Samy v. United States*, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (72 years old, 12 serious ailments, including uncontrolled hypertension, congestive heart failure, type II diabetes, and asthma); *United States v. Burrill*, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020)(defendant has served about half of 30-month sentence for investment adviser fraud; he "is 75 years old and suffers from asthma, high blood pressure, high cholesterol, diabetes, diverticulosis, blood clots, hearing loss, glaucoma, cataracts, and lower back nerve pain."); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020)(defendant has 26 days remaining on sentence; "is 65 years old and suffers from a host of medical ailments, including chronic obstructive pulmonary disease ("COPD") and asthma").

District courts take health conditions seriously when considering requests for compassionate release. But it does not swing prison doors open on a whim. This Court recently denied a request for compassionate release in *United States v. Phillip Peaks*, 16-20640. There, Phillip Peaks moved for release from Elkton FCI due to the outbreak of coronavirus cases at the facility. Peaks is 31-year-old, morbidly obese, and he suffers

from high blood pressure. Nevertheless, this Court ruled that:

> "Peaks has an elevated risk of developing the more severe symptoms of COVID-19, but that generalized risk of contracting COVID-19 and potentially developing the more severe symptoms is not akin to the type of "extraordinary and compelling reasons" justifying compassionate release identified by the Sentencing Commission. Peaks has not contracted the virus, and his medical conditions, in light of his relatively young age and access to medication, do not fall in the category of illnesses with an end of life trajectory, or other reasons, under the guidelines. A reduction in sentence would not be consistent with the policy statements issued by the Sentencing Commission. Therefore, Peaks is not entitled to compassionate release." (*See United States v. Peaks, 16-20460, Opinion and Order, Doc. 1288*).

Hayes's circumstances are no worse.  Hayes, like Peaks, does not suffer from an illnesses with an end of life trajectory. The other categories of 1B1.13 do not apply to Hayes.

## B.  The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. So even if the Court were to find Hayes eligible for compassionate release, the § 3553(a) factors should still disqualify him. Simply put, Hayes is

19

dangerous. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public

20

safety right now, and those risks will only increase if our community is faced with a sudden influx of defendant convicted of violent offenses.

Hayes is violent. Unsurprisingly, he failed to mention in his brief the planning, scope and damage that crimes caused. Hayes set up his fellow employees to be robbed at gunpoint. He intentionally placed them in harm's way, with no concern for their safety, so that a drug addict and a registered sex offender could raid their place of employment. This robbery was extremely disruptive and it put Heritage Pharmacy Services out of business. Associates who feared their death also lost their jobs because of Dominque Hayes, Jeremy Sherrod, and Arkem Hammock. To make matters worse, Hayes obstructed the police investigation by lying about his relationship with his co-defendants. Because Hayes's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A).

Given Hayes's record, it is questionable whether he would abide by the terms of home confinement—much less adhere to the CDC's social-distancing protocols and recommendations to wear a mask in public. Hayes has previously shown an unwillingness to follow even basic societal norms. Because Hayes would be unlikely to take the

COVID-19 restrictions seriously, he would also be far more likely than other members of the public to contract COVID-19—perhaps even more likely than he would be in prison—and would also be more likely to spread it to other people.

Additionally, the Covid-19 pandemic by itself does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Hayes and other inmates. In fact, Fort Dix has done so well with its protocol that Hayes and many other inmates have not contracted Covid-19 while at that facility. Thus, Hayes should remain at Fort Dix to serve out his sentence.

## Conclusion

For the reasons stated above, Hayes's motion should be denied.


Respectfully submitted,

MATTHEW SCHNEIDER
UNITED STATES ATTORNEY

_s/Jeanine Brunson_
Jeanine Brunson
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
jeanine.brunson@usdoj.gov
Dated: June 22, 2020          313-226-9597

## Certificate of Service

I hereby certify that on June 22, 2020, I electronically filed this response for the United States with the Clerk of the Court to the United States District Court, Eastern District using the ECF system, which will send notice to all users of record.

I further certify that I served this response on the petitioner by mailing a copy with first class postage to:

Dominque Hayes
Register Number: 55785-039
FCI Fort Dix
Federal Correctional Institution
P.O. Box 2000
Joint Base MDL, NJ  08640

*s/Jeanine Brunson*
Jeanine Brunson
Assistant U.S. Attorney